**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 23-4185**

───────────

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

JOSE DOMINGO ORDONEZ-ZOMETA, a/k/a Felon,

Defendant – Appellant.

───────────

**No. 23-4504**

───────────

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

JOSE HENRY HERNANDEZ-GARCIA, a/k/a Paciente,

Defendant – Appellant.

───────────

**No. 23-4603**

───────────

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

JOSE RAFAEL ORTEGA-AYALA, a/k/a Impaciente,

Defendant – Appellant.

---

Appeals from the United States District Court for the District of Maryland, at Greenbelt. Paula Xinis, District Judge.  (8:20-cr-00229-PX-1; 8:20-cr-00229-PX-3; 8:20-cr-00229-PX-2)

---

Argued:  March 21, 2025                                  Decided:  June 17, 2025

---

Before KING, GREGORY, and HEYTENS, Circuit Judges.

---

Affirmed by published opinion.  Judge King wrote the opinion, in which Judge Gregory and Judge Heytens joined.

---

**ARGUED:**  Stuart A. Berman, LERCH, EARLY & BREWER, CHARTERED, Bethesda, Maryland; Allen Howard Orenberg, ORENBERG LAW FIRM, LLC, Rockville, Maryland; Jonathan D. Byrne, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, West Virginia, for Appellants.  Michael Alan Rotker, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Nicole M. Argentieri, Principal Deputy Assistant Attorney General, Criminal Division, Lisa H. Miller, Deputy Assistant Attorney General, Matthew Hoff, Jared Engelking, Michael Morgan, Violent Crime and Racketeering Section, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Erek L. Barron, United States Attorney, Baltimore, Maryland, William Moomau, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee.

---

2

KING, Circuit Judge:

Defendants Jose Ordonez-Zometa, Jose Hernandez-Garcia, and Jose Ortega-Ayala were each convicted and sentenced in the District of Maryland for conspiracy to participate in the affairs of a racketeering enterprise under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), in violation of 18 U.S.C. § 1962(d); murder in aid of racketeering and conspiracy to commit murder in aid of racketeering under the Violent Crimes in Aid of Racketeering Activity statute ("VICAR"), in violation of 18 U.S.C. § 1959(a)(1) and 18 U.S.C. § 1959(a)(5); and conspiracy to destroy and conceal evidence, in violation of 18 U.S.C. § 1512(c)(1) & (k). Defendants challenge their various convictions on four separate grounds. Hernandez-Garcia also challenges the district court's denial of his motion for a new trial. Finding no reversible error, we affirm the Defendants' convictions and sentences, and the court's denial of Hernandez-Garcia's motion for a new trial.

I.

On the night of March 8, 2019, the Defendants, alongside other members of the Los Ghettos Criminales Salvatruchas ("LGCS"), a Maryland-based branch of the violent street gang La Mara Salvatrucha ("MS-13"), brutally murdered a 16-year-old member of their own gang.[1] Gang members then dumped the young victim's body on a secluded dirt road

---

[1] Defendants are members of the street gang La Mara Salvatrucha, commonly known as "MS-13." MS-13 traces its origins to the 1980s, when Salvadoran immigrants in Los Angeles formed the gang to protect themselves from other street gangs. *See United*
(Continued)

3

in Stafford County, Virginia.  In an effort to conceal their crimes, the LGCS members doused the victim's body in gasoline and then set it on fire, before abandoning his burning body on the road.

A.

Defendant Jose Ordonez-Zometa was the leader of the LGCS gang, or "clique."  On March 8, 2019 — acting on a suspicion that two juvenile members were cooperating with law enforcement — he convened a meeting of the clique at his residence on Varnum Street in Hyattsville, Prince George's County, Maryland.  At that meeting, Ordonez-Zometa intended to confront the young men about their suspected cooperation with law enforcement — a capital offense within the MS-13 hierarchy.  Indeed, the only punishment prescribed by MS-13's rules for that offense is death.

In advance of the meeting, Ordonez-Zometa instructed the two suspected juveniles to bring their "papers" — that is, present proof that they had not been cooperating with law enforcement.  He summoned several other gang members to the meeting — including the eventual victim, identified here as "John Doe" — and Defendants Jose Hernandez-Garcia

---

*States v. Palacios*, 677 F.3d 234, 238 (4th Cir. 2012).  Since then, MS-13 has grown into a sprawling — and often violent — criminal enterprise that operates throughout the United States and several Central American countries.  *See United States v. Zelaya*, 908 F.3d 920, 924 (4th Cir. 2018).  The gang operates through local chapters called "cliques," which vary in structure and autonomy.  *See United States v. Ayala*, 601 F.3d 256, 261 (4th Cir. 2010).  For example, some cliques engage in extortion by targeting local drug dealers and businesses; others participate in drug trafficking on an international scale.  *See, e.g.*, *Ayala*, 601 F.3d at 261; *see also Zelaya*, 908 F.3d at 924.  Despite the apparent differences between "cliques," each chapter of MS-13 abides by the larger gang's rules and protocols.

and Jose Ortega-Ayala.[2]  John Doe and Hernandez-Garcia, along with others, travelled in a shared Uber from northern Virginia to Ordonez-Zometa's house on Varnum Street. Defendant Ortega-Ayala arrived separately from his home in Maryland.

Once assembled, Ordonez-Zometa questioned the two young gang members.  John Doe denied any cooperation with law enforcement, but Ordonez-Zometa remained unconvinced.  At one point during the evening, Ordonez-Zometa was overhead calling a senior MS-13 member in El Salvador — later identified as "Pinguino" — and expressing certainty that one of the juveniles had informed on the gang.  But, in fact, neither of the youths had cooperated with law enforcement.  Instead, both had recent and brief interactions with police after running away from their homes.

After hanging up the phone call with Pinguino, Ordonez-Zometa began assaulting John Doe, all the while demanding that Doe prove that he was not cooperating with the police.  As John Doe repeatedly denied this allegation, and pleaded for the beating to stop, Ordonez-Zometa cut Doe's face and forced a heavy dumbbell onto his body to prevent Doe from moving.  Ordonez-Zometa ordered that John Doe be taken to the basement, and instructed one gang member to go upstairs and retrieve a weapon referred to as the "glove" — a three-bladed weapon that can be affixed to an individual's hand — so that the MS-13 gang could "make pieces out of [John Doe]."

---

[2] We refer to the juvenile victim as "John Doe" in order to protect his privacy. *See, e.g.*, *Doe v. Sidar*, 93 F.4th 241, 248 (4th Cir. 2024) (explaining that the use of "fictitious names" is favored "when necessary to protect the privacy" of minor victims (internal quotation marks and alterations omitted)).

Once in the basement, Ordonez-Zometa ordered another member of the group to begin recording on his cell phone. Then, at the direction of Ordonez-Zometa, the gang members — including Defendants Hernandez-Garcia and Ortega-Ayala — commenced a brutal and horrific attack on John Doe. On Ordonez-Zometa's orders, each LGCS member present in the basement stabbed John Doe with the "glove," and in such a violent fashion that two of the blades on the "glove" broke off. In total, John Doe suffered 144 multiple sharp force injuries. Doe died from those injuries in Ordonez-Zometa's basement, at just 16 years of age.

Afterward, and still following Ordonez-Zometa's instructions, the group began covering their tracks. They carried Doe's body upstairs, wrapped it in black plastic trash bags, and placed it in the trunk of a Nissan Altima belonging to Ordonez-Zometa's wife. Ordonez-Zometa then directed three gang members, including Ortega-Ayala, to dispose of Doe's body. Meanwhile, Ordonez-Zometa told Hernandez-Garcia and another coconspirator to clean the scene of the murder using cleaning supplies that he provided, and to remove and dispose of the blood-stained carpeting on the basement stairs.

The three gang members tasked with disposing of John Doe's body, as well as the murder weapon, left Ordonez-Zometa's house in the Nissan. After stopping to fill up plastic water bottles with gasoline, they eventually arrived near a wooded area in Stafford County, Virginia, where they dumped John Doe's body on a secluded road, doused it in gasoline, and set it afire before returning to Ordonez-Zometa's house in Maryland. There, they undertook efforts to clean the trunk and rear exterior of the vehicle to remove blood

evidence.  The group then gathered to casually watch a video of Doe's murder, which had been recorded and shared by one of the participants.

### B.

At approximately 5:00 a.m. the next morning — that is, March 9, 2019 — Stafford County Sheriff's Deputy John McAllister observed flames while on patrol near River Road, a wooded area alongside the Rappahannock River near Fredericksburg.  Upon investigating the source of the flames, Deputy McAllister discovered the burning remains of a human body.  Investigators recovered the partially incinerated corpse along with other items found at the scene, including a water bottle, a burned shoe sole, and various debris.

Initially, Stafford County investigators were unable to identify the partially burned remains, as they were unrecognizable.  Investigators circulated flyers bearing an image of a distinctive tattoo located on the victim's arm, accompanied by a request for public assistance in identifying the victim's remains.  As a result of those flyers, the victim's mother came forward and identified the tattoo as belonging to her son, John Doe.  John Doe's mother also gave investigators the names of individuals her son had been with shortly before his death, including Hernandez-Garcia.  After investigators interviewed witnesses, evidence emerged that implicated not only Hernandez-Garcia, but also Ordonez-Zometa and Ortega-Ayala, in the killing of John Doe, the subsequent burning of Doe's body, and the destruction of evidence.

On March 12, 2019, a Stafford County judge issued an arrest warrant for Ordonez-Zometa.  The next day, Stafford County detectives contacted Lieutenant Paul Aguiar of the Prince George's County Police Department ("PGPD"), who served as the head of PGPD's

7

MS-13 gang squad.  They informed Lieutenant Aguiar that, although John Doe's body had been found in Virginia, new evidence suggested that his murder had actually taken place in Prince George's County, Maryland — and, more specifically, at Ordonez-Zometa's house on Varnum Street, in Hyattsville.  The investigation was accordingly transferred to PGPD.

On March 13, 2019, after the investigation had been transferred to PGPD, the Stafford County detectives travelled to Hyattsville to meet with Lieutenant Aguiar and PGPD officers.  The Stafford County detectives confirmed that murder charges were pending against Ordonez-Zometa, and they provided PGPD officers with a copy of the wanted flyer containing Ordonez-Zometa's photograph.  The detectives also advised Aguiar to be on the lookout for a particular vehicle — a gold Nissan Altima with a black hood — that they believed had been used to transport John Doe's body to Virginia.

PGPD officers immediately began surveillance of Ordonez-Zometa's Varnum Street residence.  That afternoon, they observed multiple individuals exit the house, including one who matched the description and the photograph of Ordonez-Zometa.  The individuals entered a gold Nissan with a black hood, also matching the description provided by Stafford County.  The vehicle departed the residence, proceeded onto a side street, and then turned onto a public roadway.  It was at that point that Lieutenant Aguiar, who was observing from an unmarked police vehicle, noticed that the driver failed to use a turn signal.  He relayed this traffic violation to uniformed officers in marked police vehicles, who stopped the Nissan at approximately 6:50 p.m.  The officers identified Ordonez-Zometa as a passenger in the vehicle, removed him, and placed him in handcuffs.  Officers

8

also seized a Samsung cell phone that was in his possession. The remaining passengers, who were members of Ordonez-Zometa's family, were also removed and taken to the police station. The Nissan was impounded for further evidentiary processing.

C.

1.

At approximately 7:42 p.m. on the evening of his arrest on March 13, Ordonez-Zometa was taken to an interview room at the PGPD headquarters and handcuffed. He remained in the interview room while Detective Zedrick DeLeon, a PGPD homicide investigator, conferred with detectives from Stafford County for approximately two hours. The purpose of that meeting was to debrief Detective DeLeon regarding the status and scope of the Virginia investigation. While Detective DeLeon conferred with Stafford County detectives, Ordonez-Zometa appeared to be sleeping in the interview room.

At 11:22 p.m., Detective DeLeon initiated a custodial interrogation of Ordonez-Zometa. DeLeon, a native Spanish speaker, conducted the questioning in Spanish. He began the interview by asking Ordonez-Zometa routine booking questions. Approximately fifteen minutes into the session, he advised Ordonez-Zometa of his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436 (1966). When asked whether he understood those rights, Ordonez-Zometa responded affirmatively.

Over the course of the interview, Ordonez-Zometa repeatedly expressed concern for his family. He stated that he could hear his young son crying in a nearby room, and he objected to what he perceived as the mistreatment of his wife during the arrest. He also indicated that he was reluctant to speak on camera, citing his fear that other MS-13

9

members would later learn the contents of his statement. Based on those fears, Ordonez-Zometa asked to continue the conversation in a more private setting, and implied that he would be willing to speak more freely if he could obtain some form of consideration in return. Detective DeLeon responded that he would consult his supervisor about relocating the interview, plus check on the status of Ordonez-Zometa's family. DeLeon then arranged for Ordonez-Zometa to be provided with water and allowed to use the restroom.

When Detective DeLeon returned, Ordonez-Zometa again asked about his wife. DeLeon responded that "she's O.K." *See* J.A. 2479.[3] A short time later, DeLeon told Ordonez-Zometa that his supervisor had approved moving the conversation to another room — one that was not equipped with a video camera and would, in DeLeon's words, feel less "tight." *Id.* at 2480. The two men then relocated to a nearby conference room, which lacked any fixed audio or video recording equipment. DeLeon, however, brought a small audio recorder in his shirt pocket and used it to record the conversation.

Once inside the conference room, Ordonez-Zometa asked what his options were, "bad or good." *See* J.A. 2482-83. Detective DeLeon explained that he could not make promises because it was the prosecutors — not the police — who determined the available options. Still, DeLeon added that, in his experience, people who tell the truth "usually get a lot of . . . consideration." *Id.* at 2484. He also made clear that Ordonez-Zometa was under no obligation to speak, and that if he declined to do so, DeLeon would simply tell the judge and jury that Ordonez-Zometa "didn't wanna talk." *Id.* DeLeon, however,

---

[3] Citations to J.A. _____ refer to the Joint Appendix filed by the parties in this appeal.

followed up by posing a hypothetical scenario to Ordonez-Zometa — one in which Ordonez-Zometa says, "no [D]etective DeLeon, I'm not going to tell you anything." *Id.* at 2003. DeLeon then answered the hypothetical for Ordonez-Zometa, and stated

> O.K. no problem. But when we go . . . in front of the judge and jury . . . I'm gonna be asked, [D]etective DeLeon, did you have a chance to talk with Jose, clearly.
>
> What did he tell you, he told me he didn't want to talk. You as a juror hearing that, how are you gonna look or how are you gonna think about that person that, that says that. No, I'm asking, how are you gonna look at the person . . . in a good light or bad light?
>
> . . . Bad.

*Id.* DeLeon explained that the police were interviewing other gang members and advised Ordonez-Zometa this was his opportunity to explain what had happened on the evening of March 8, 2019.

Ordonez-Zometa responded that he wished to "talk personally" with Detective DeLeon because he knew DeLeon wanted to "hear [his] version," and because he assumed DeLeon would want to know "if the rest that were interrogated are liars." *See* J.A. 2485. Ordonez-Zometa stated that he knew "all of this is wrong" and that he would not deny his involvement in the murder, but said he wanted to know whether he and his family would be protected in exchange for cooperation. *Id.* at 2485-86. Ordonez-Zometa explained that his involvement in MS-13 had caused him a lot of "problems," "pressure," and "headaches." *Id.* at 2488. And he expressed that he wanted to "talk about everything" because he "mean[s] to change." *Id.* At this point, DeLeon reminded him that "a kid was killed," and Ordonez-Zometa responded, "of course I'm telling you, I'm not innocent." *Id.*

11

at 2489. He then repeated that he had made "a very big mistake," later adding, "I know I, I screwed up . . . with everything that happened." *Id.* at 2513.

From there, Ordonez-Zometa described his role in the events surrounding the murder of John Doe. *See* J.A. 2024-2040. He said he received a call from a gang leader in El Salvador; that he believed John Doe had lied about speaking with the police; and that he directed other members of the LGCS clique to assault Doe using a distinctive weapon, known within the gang as the "glove." He then recounted how Doe was taken to the basement and stabbed to death. While he denied personally committing the stabbing, Ordonez-Zometa acknowledged that he had issued orders to LGCS members concerning the assault, the disposal of John Doe's body, and the cleanup efforts that followed. He stated that he was just following orders from a higher-ranking member of MS-13 — that is, "Pinguino" — "from [El] Salvador." *See* J.A. 2513.

At 2:40 a.m. on the morning of March 14, Detective DeLeon escorted Ordonez-Zometa back to the original interview room. Once there, Detective DeLeon assured Ordonez-Zometa that he had relayed his messages to his wife and told him that his family members were safe. Ordonez-Zometa then signed a waiver authorizing PGPD to obtain his DNA, take photographs, and collect his clothing.

Based on Ordonez-Zometa's statements, and the information provided by Stafford County investigators, PGPD and federal law enforcement obtained warrants to search Ordonez-Zometa's residence on Varnum Street, his Samsung cell phone, and the impounded Nissan. Those searches produced significant physical evidence, including photographs of the murder weapon and the victim's body on Ordonez-Zometa's phone;

12

bloodstains matching the victim's DNA in both the basement of Ordonez-Zometa's home and the trunk of the Nissan; and additional forensic traces corroborating the sequence of events described by the other witnesses.

### 2.

On March 20, 2019, PGPD police obtained an arrest warrant for Ortega-Ayala based on interviews and information indicating that he was also involved in the murder of John Doe and in the disposal of his body. The supporting affidavits detailed Ortega-Ayala's known association with the MS-13 street gang; his physical presence during critical events; and his communications that, as investigators believed, tied him to the homicide of John Doe and the gang's subsequent efforts to conceal it. On that same day, PGPD officers arrested Ortega-Ayala in Arlington, Virginia, and then seized a white Apple iPhone that was in his possession.

Law enforcement officers also secured multiple search warrants for Ortega-Ayala's belongings and residence, in addition to the warrant to search the phone seized during his arrest. After his arrest, a PGPD detective had obtained a search warrant for Ortega-Ayala's residence in Greenbelt, Maryland. And later, on April 8, 2019, a PGPD Detective applied for and received a warrant to extract cell data from the Ortega-Ayala cell phones seized by law enforcement during his arrest and the search of his residence. Still later, on December 23, 2019, a Federal Bureau of Investigation ("FBI") Special Agent secured a federal warrant to extract additional information from the same phone, plus a warrant on February 21, 2020 for information associated with a Facebook account believed to be associated with Ortega-Ayala.

13

Investigators sought access to Ortega-Ayala's cell phone and Facebook accounts, specifying that those digital platforms likely contained communications relevant to the murder of John Doe and its concealment, plus other related actions — including the distribution of a video depicting Doe's killing. The affidavits represented that Ortega-Ayala's digital communications were part of the gang's broader criminal infrastructure. Investigators also obtained a search warrant for Ortega-Ayala's residence, seeking physical evidence — such as documents, additional communications, and forensic evidence — linking him to the murder of John Doe and Ortega-Ayala's involvement in LGCS criminal enterprises. The affidavits supporting the search warrant for Ortega-Ayala's residence recited detailed accounts of his movements and his connections to the LGCS's criminal activities.

## II.

### A.

More than a year after the state charges, on July 29, 2020, a federal grand jury in the District of Maryland returned a one-count indictment charging Ordonez-Zometa, Ortega-Ayala, and Hernandez-Garcia, plus another codefendant, Kevin Rodriguez-Flores, with conspiracy to destroy and conceal evidence, in violation of 18 U.S.C. § 1512(k). On October 21, 2020, the grand jury returned a superseding indictment charging the four

14

codefendants with conspiracy to participate in a racketeering enterprise, in violation of 18 U.S.C. § 1962(d), plus a conspiracy to destroy and conceal evidence.[4]

On December 21, 2021, the grand jury returned the four-count second superseding indictment underlying these proceedings, charging Ordonez-Zometa, Ortega-Ayala, and Hernandez-Garcia each with a RICO conspiracy to participate in a racketeering enterprise, in violation of 18 U.S.C. § 1962(d) (Count One); a VICAR conspiracy to commit murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5) (Count Two); a VICAR murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1) (Count Three); plus conspiracy to destroy and conceal evidence, in violation of 18 U.S.C. § 1512(c)(1) & (k) (Count Four).

## B.

Defendants Ordonez-Zometa, Ortega-Ayala, and Hernandez-Garcia filed several motions to suppress evidence.[5]  On August 4, 2022, Ortega-Ayala moved to suppress evidence obtained from the warranted searches of his white iPhone, his residence, and his Facebook account.  Ortega-Ayala did not dispute that the warrant applications established

---

[4] Rodriguez-Flores pleaded guilty to both counts of the superseding indictment and, on June 21, 2021, he was sentenced to concurrent sentences of 240 months' imprisonment and 360 months' imprisonment.

[5] Hernandez-Garcia filed various motions to suppress evidence obtained from the seizure of his cell phone, a warranted search of his email account, a warranted search of his Facebook account, plus statements he made after his arrest.  Following an evidentiary hearing, the district court denied Hernandez-Garcia's motions to suppress.  Hernandez-Garcia does not challenge the court's denial of those suppression motions on appeal, and we therefore dispense with further discussion of those motions.

15

probable cause, but instead claimed that those warrants did not set forth sufficient facts to establish a likelihood that evidence of criminality would be found in any of the places to be searched. The next day, on August 5, 2022, Ordonez-Zometa filed an omnibus motion to suppress, seeking to suppress evidence obtained from the traffic stop of the Nissan vehicle, his custodial interview, and the searches of his residence and cell phone. He argued that the stop of the Nissan and his subsequent arrest were unlawful; that the search of his cell phone was improper; and that his post-arrest statements to Detective DeLeon were involuntary and thus inadmissible.

On September 2, 2022, the district court conducted a consolidated evidentiary hearing to address the defendants' pretrial motions. After hearing testimony — including the evidence of Lieutenant Aguiar and Detective DeLeon — and assessing the defendants' arguments, the court denied all of the defendants' motions to suppress. More specifically, the court upheld the stop of the Nissan, concluding that it was lawfully conducted for the purpose of executing an outstanding arrest warrant. The court also found that the warrant authorizing the search of Ordonez-Zometa's cell phone was supported by probable cause — specifically, by facts indicating that the phone likely contained evidence of criminal activity. But even if the warrant had fallen short, the court ruled, suppression would not be warranted because the officers had acted with objectively reasonable reliance on the warrant's validity. Finally, the court ruled that Ordonez-Zometa's post-arrest statements to Detective DeLeon were admissible.

The district court also denied Ortega-Ayala's motions to suppress, ruling that the affiants had set forth sufficient facts to justify their belief, based on their training and

16

experience, that there was ample reason to believe that evidence of criminal activity could be found in the places to be searched. With respect to the warrant for Ortega-Ayala's Facebook account, the court observed that the affiant had explained two key supporting factors: First, that MS-13 frequently used social media to communicate and coordinate its criminal activity; and second, that a search of Ortega-Ayala's Facebook account might reveal connections among coconspirators involved in the murder of John Doe.

Next, the court explained that the affidavit supporting the search of Ortega-Ayala's residence had indicated that Ortega-Ayala took an Uber ride home on the morning following Doe's murder. From that, the court reasoned, it was reasonable to infer that someone who had just participated in a killing, and who had helped dispose of the victim's body, might carry incriminating evidence back with him. Finally, the court explained that the affidavit to search Ortega-Ayala's white iPhone was sufficiently supported. The affiant had explained that law enforcement had reason to believe that the murder of John Doe had been recorded on video and, when combined with evidence that MS-13 regularly used cell phones to communicate, the search of Ortega-Ayala's cell phone was justified. Moreover, the court ruled that the officers who executed the search warrants acted in good faith — so, even if probable cause had been lacking, a suppression ruling was not warranted.

C.

The Defendants' joint trial began on December 7, 2022. Over the course of the eight-day jury trial, the government presented the testimony of, inter alia, the Stafford County detective who discovered John Doe's body; PGPD Lieutenant Aguiar and

17

Detective DeLeon; former LGCS members as cooperating witnesses; and an expert witness concerning transnational criminal organizations, including MS-13.

The prosecution also presented the testimony of an FBI forensic expert, Agent Luis DeJesus, who had conducted a cell-site analysis of Hernandez-Garcia's cell phone.[6] As relevant here, Agent DeJesus testified that the cell-site analysis of Hernandez-Garcia's phone activity between 5:30 p.m. on March 8 and 6:00 a.m. on March 9, 2019 showed that Hernandez-Garcia's phone was located in the vicinity of 7000 Varnum Street, the site of Doe's murder. *See* J.A. 1543-1560. DeJesus also explained that he made several drafts of the expert report summarizing his opinions, before finalizing a peer-reviewed version. *Id.* at 1546-1547; *see also id.* at 2559-2576.

Agent DeJesus acknowledged in his expert testimony that a draft report contained a data point that was omitted from the final report. He explained that draft reports often contain data later omitted from the final version of such reports, either because the relevant time frame had been refined or because certain data points are deemed unreliable. The omitted data point was a record suggesting that Hernandez-Garcia's phone was "somewhere to the north" of 7000 Varnum Street at 11:32 a.m. on March 9. 2019. *See* J.A. 1569. DeJesus explained that he omitted this data point from his expert report because the

---

[6] A cell-site analysis is a technique used by law enforcement to estimate a cell phone's location over time by examining historical records of those cell towers the phone connected to during calls, texts, or data use. By mapping these connections, investigators can approximate a phone's movements and potentially place it near a crime scene or other relevant location.

investigative team had requested that he narrow down the relevant time frame, and because there were concerns about the data point's reliability. *See id.* at 1569-1570.

In his closing argument, Hernandez-Garcia's defense counsel argued that the omitted data point was exculpatory, suggesting that it showed Hernandez-Garcia could not have been present at the crime scene during the murder of John Doe. Counsel argued that the data point indicated Hernandez-Garcia was at another location at 11:32 a.m., which — according to the defense — undermined the government's theory of prosecution. *See* JA. 1803.

After the eight-day trial, a jury found Ordonez-Zometa, Ortega-Ayala, and Hernandez-Garcia each guilty under Count One of the RICO racketeering conspiracy, with a special finding that they had murdered John Doe feloniously, willfully, and with premeditated malice.[7] The jury also convicted each of the three defendants of the VICAR conspiracy to commit murder in aid of racketeering, under Count Two, and the VICAR murder in aid of racketeering, under Count Three, plus the conspiracy to destroy and conceal evidence.[8]

---

[7] Count One charged the Defendants with RICO conspiracy, which requires proof that they associated with a criminal enterprise whose activities affected interstate or foreign commerce. More specifically, section 1962(c) of Title 18 makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct, participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

[8] Count Two and Count Three charged the Defendants with conspiracy to commit murder and murder under the Violent Crimes in Aid of Racketeering Activity statute — 18 U.S.C. § 1959 — "otherwise simply known as VICAR," which was enacted by Congress (Continued)

19

Following the verdict, Hernandez-Garcia moved for a judgment of acquittal or, alternatively, for a new trial, relying in part on Agent DeJesus's omission of the 11:32 a.m. cell site data point in his expert report. *See* JA. 376-79. The district court denied both motions. In resolving Hernandez-Garcia's motion for acquittal, the court found that the verdict was "well supported" when the evidence was viewed in the light most favorable to the government. *Id.* at 1878-79. As to his motion for a new trial, the court acknowledged that a different standard applied — namely, that a new trial may be warranted if the evidence "weighs heavily against conviction." *Id.* at 1879. Applying that standard, the court found no basis for new trial relief. It explained that DeJesus's credibility had been thoroughly explored at trial — on both direct and cross-examination — and that the jury had an opportunity to weigh the significance of the omitted data point during the closing arguments. In the court's view, a retrial was not at all warranted.

On March 6, 2023, the district court sentenced Ordonez-Zometa to two concurrent terms of life imprisonment on Counts One and Three, 120 months in prison on Count Two, and 240 months on Count Four. Ordonez-Zometa was also sentenced to concurrent five-year terms of supervised release on Counts One and Three and concurrent three-year terms

---

"as the violent crime corollary to the RICO Act." *See United States v. Tipton*, 95 F.4th 831, 844 (4th Cir. 2024). The VICAR statute incorporates RICO's jurisdictional requirement into the definition of "enterprise," which means a group of individuals associated in fact whose activities "affect[] interstate or foreign commerce." *See* 18 U.S.C. § 1959(b)(2). As such, a federal court's jurisdiction over VICAR offenses is predicated on the enterprise's nexus to interstate or foreign commerce. Count Two and Count Three thus required proof beyond a reasonable doubt that the VICAR offenses were committed for the purpose of maintaining or increasing the Defendant's respective positions in a racketeering enterprise. *Id.* § 1959(a).

20

of supervised release on Counts Two and Four.  On August 4, 2023 and September 25, 2023, the court imposed the same sentences on Hernandez-Garcia and Ortega-Ayala, respectively.

Defendants Ordonez-Zometa, Ortega-Ayala, and Hernandez-Garcia each then filed timely notices of appeal from their criminal judgments.  We thus possess jurisdiction to resolve their consolidated appeals, pursuant to 28 U.S.C. § 1291.

### III.

The Defendants present four principal challenges on appeal.  First, Defendant Ordonez-Zometa contends that all the evidence derived from his arrest and custodial interrogation should have been suppressed.  More specifically, he contends that the stop of the Nissan automobile in which he was a passenger was unsupported by reasonable suspicion or probable cause, and that the police unlawfully delayed his arrest to gain a tactical advantage.  He also maintains that his post-arrest statements were involuntary and the product of coercive interrogation tactics and undue delay in his presentment to a judicial officer.

Next, Defendant Ortega-Ayala asserts that the district court erred in denying his motion to suppress evidence obtained from overly broad and insufficiently particularized search warrants for his Facebook account, his residence, and his cell phone.  And Hernandez-Garcia, for his part, argues that the district court abused its discretion in denying his motion for a new trial, asserting that the testimony of Agent DeJesus — the

21

government's cell-site data expert — undermined the integrity of the jury's verdict and warranted a new trial.

Finally, each of the Defendants challenges the sufficiency of the evidence on their RICO and VICAR convictions — that is, Counts One, Two, and Three — and assert that the government failed to prove that the alleged racketeering enterprise affected interstate commerce.

## A.

We turn first to Ordonez-Zometa's contentions regarding the district court's denial of his omnibus motion to suppress evidence obtained from the traffic stop, his post-arrest interrogation, and the search of his cell phone. He first asserts that the stop of the Nissan lacked probable cause, rendering unlawful his arrest and all evidence obtained from the traffic stop. He next contends that the officers delayed executing his arrest warrant until he entered the Nissan, in order to gain a tactical advantage. Finally, he challenges the admission of his post-arrest statements, maintaining that they were involuntary despite his waiver of *Miranda* rights, because his will was overborne by a combination of the circumstances of his interrogation and Detective DeLeon's misstatements to him.

In reviewing a denial of a motion to suppress, we review the district court's legal conclusions de novo and factual findings for clear error. *See United States v. Pulley*, 987 F.3d 370, 376 (4th Cir. 2021). And "[w]hen, as here, a suppression motion has been denied, this Court reviews the evidence in the light most favorable to the government." *See United States v. Bailey*, 74 F.4th 151, 156 (4th Cir. 2023) (internal quotation marks omitted). Because there was no error in the district court's denial of Ordonez-Zometa's omnibus

22

suppression motion, we reject each of Ordonez-Zometa's contentions and affirm the district court's challenged rulings.

1.

a.

We begin with Defendant Ordonez-Zometa's challenge to the district court's denial of his motion to suppress evidence obtained from the traffic stop that resulted in his arrest. He asserts that the evidence seized and discovered following his arrest should be suppressed as the fruit of an illegal arrest, in that the officers lacked probable cause to stop the Nissan in which he was a passenger.

As we have recognized, "[a] traffic stop constitutes a 'seizure' under the Fourth Amendment." *See United States v. Williams*, 808 F.3d 238, 245 (4th Cir. 2015). And so, like any seizure, a traffic stop "is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *See Whren v. United States*, 517 U.S. 806, 810 (1996). Importantly, "the subjective motivations of the individual officers . . . ha[ve] no bearing on whether a particular seizure is 'unreasonable' under the Fourth Amendment." *See Graham v. Connor*, 490 U.S. 386, 397 (1989). Rather, our reasonableness inquiry turns on whether "the circumstances, viewed objectively, justify the action." *See Brigham City v. Stuart*, 547 U.S. 398, 404 (2006) (internal quotation marks and alterations omitted).

Put simply, we ask whether the circumstances known to law enforcement at the time of the seizure would lead a reasonable officer to act as he did. *See Hunsberger v. Wood*, 570 F.3d 546, 554 (4th Cir. 2009); *see also Brigham City*, 547 U.S. at 404. One such circumstance — and, indeed, a critical one here — is an officer's knowledge of an

23

outstanding warrant for arrest. That knowledge alone can justify a traffic stop. *See United States v. Hensley*, 469 U.S. 221, 232 (1985).

That brings us to the traffic stop challenged here. The police officers knew that Ordonez-Zometa was wanted for murder and, moreover, that there was a warrant for his arrest. *See* J.A. 619 (clarifying that "there's no dispute that Detective Aguiar testified [that] the officers who stopped . . . knew of the felony warrant"). And due to information obtained from Stafford County detectives, the officers had a photograph of Ordonez-Zometa and a description of the vehicle used to move John Doe's body. And they watched a man who matched the photograph of Ordonez-Zometa leave a residence suspected to be the murder scene, get into a car matching the description of one tied to the Doe murder, and drive away. That was certainly enough to justify the traffic stop.

Considering these circumstances, the district court correctly determined that the officers were entitled to stop the Nissan in order to execute the arrest warrant for Ordonez-Zometa. *See* J.A. 623-24 ("I don't think there's any dispute that factually there was enough probable cause, in combination with information learned through Stafford County, the identification of the house, the vehicle parked in front of the house, that [the] vehicle was involved in transporting this body."); *id.* at 624 ("[I]t's undisputed that after the vehicle is stopped, they've identified the passenger as Mr. Ordonez-Zometa, and they have the arrest warrant, which gives them probable cause to execute that arrest warrant."). That objective

24

knowledge, as the court properly found, provided "sufficient probable cause" for the PGPD investigators to conduct a traffic stop and arrest Ordonez-Zometa. *Id.* at 623.[9]

b.

We agree that the district court properly rejected Ordonez-Zometa's motion to suppress evidence obtained following his arrest, in that the arrest warrant justified the stop of Ordonez-Zometa's vehicle. But we also address the court's secondary finding that the officers had an independent justification for the traffic stop "based on recognizing [the Nissan] . . . as the vehicle used to transport [John Doe's] body." *See* J.A. 623. That is, the officers also believed that the Nissan itself was used to transport John Doe's body from Maryland to Virginia. Those facts readily justify the stop of the Nissan under the well-established "automobile exception," which allows for a traffic stop when "officers ha[ve] probable cause to believe that the automobile was an instrumentality of [a] crime." *See United States v. Dickey-Bey*, 393 F.3d 449, 457 (4th Cir. 2004).

Ordonez-Zometa, however, challenges the rationale relied on by the district court. The officers, Ordonez-Zometa asserts, did not have a sufficient basis to suspect that the

---

[9] The district court also correctly discerned that the outstanding arrest warrant for Ordonez-Zometa — not the failure of the driver to use the vehicle's turn signal — was the "big thing" justifying the traffic stop. *See* J.A. 617. In any event, a driver's failure to use a turn signal can provide probable cause to justify a traffic stop. *See, e.g.*, *Whren v. United States*, 517 U.S. 806, 819 (1996) (holding that vehicle was properly stopped for, inter alia, failure to signal in violation of a District of Columbia traffic code). And contrary to Ordonez-Zometa's arguments, the non-issuance of a citation does not establish that the stop was unlawful. *See, e.g.*, *United States v. Jackson*, 682 F.3d 448, 453 (6th Cir. 2012) ("The fact that a traffic violation is not an arrestable offense does not divest the police of authority to stop the vehicle.").

25

Nissan in which he was a passenger was actually involved in the disposal of John Doe's body — only a mere possibility that it was the same vehicle described by Stafford County detectives. The Stafford County detective's description of "a gold car with a black hood" is, as Ordonez-Zometa claims, "a description that could potentially apply to thousands of vehicles." *See* Br. of Appellants 22.

But the "mere possibility" that other vehicles might conceivably match this description "does not defeat probable cause." *See United States v. Gary*, 528 F.3d 324, 327 (4th Cir. 2008). Indeed, the Supreme Court has made clear that probable cause is — "as the very name implies" — about probabilities. *See Illinois v. Gates*, 462 U.S. 213, 231 (1983) (internal quotation marks omitted). Such probabilities, as the Court has emphasized, "are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* And so, in assessing whether the officers had probable cause to stop the Nissan vehicle, we look to the totality of the circumstances, as viewed through that everyday, practical lens. *See Florida v. Harris*, 568 U.S. 237, 244 (2013); *see also Gates*, 462 U.S. at 230.

The applicable circumstances begin with the description of the Nissan vehicle, as relayed to PGPD detectives, that was believed to be used to transport and dispose of John Doe's body: A "gold Nissan with a black hood." *See* J.A. 520. Not long after that description was relayed to PGPD, Lieutenant Aguiar spotted a vehicle matching that description parked in the driveway of the very residence suspected to be the scene of John Doe's murder. The assessment of the totality of those circumstances — that is, the specific vehicle description, the connection to the crime, and its presence at a key location —

26

resulted in a probability "on which reasonable and prudent men" were sufficiently justified to act. *See Gates*, 462 U.S. at 231.

The district court recognized as much, and did not err in its determination that the officers had probable cause to effectuate the traffic stop of Ordonez-Zometa's vehicle based on the automobile exception. We emphasize that Ordonez-Zometa's arrest warrant also provided sufficient probable cause to stop the Nissan in which he was travelling. In short, the traffic stop was lawful on multiple bases, and the court did not err in denying Ordonez-Zometa's suppression motion. We thus affirm the denial ruling.

c.

Notwithstanding the legality of the traffic stop, Ordonez-Zometa argues that it was "constitutionally impermissible" for the police to wait until he exited his home and got into the Nissan vehicle before executing the arrest warrant against him. That delay, Ordonez-Zometa asserts, was solely to gain a "tactical advantage that would allow them to search the Nissan and detain other individuals." *See* Br. of Appellants 23.

Notably, Ordonez-Zometa failed to raise this contention in the district court. Because Ordonez-Zometa did not present this issue below, we review it for plain error only. *See* Fed. R. Crim. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."); *see also United States v. Tate*, 845 F.3d 571, 575 (4th Cir. 2017). Ordonez-Zometa thus "bears the burden of establishing (1) that the district court erred; (2) that the error was 'plain'; and (3) that the error 'affect[ed his] substantial rights,' meaning that it 'affected the outcome of the district court proceedings.'" *See United States v. Bennett*, 698 F.3d 194, 200 (4th Cir. 2012)

27

(quoting *United States v. Olano*, 507 U.S. 725, 732, 734 (1993)).  And to prevail, Ordonez-Zometa must establish all three prongs of this plain error test.

He fails in this situation, however, on the first prong.  *See, e.g.*, *Tate*, 845 F.3d at 575.  The record demonstrates that the district court did not err in denying his suppression motion on the basis of undue delay.  To be sure, police officers should act with diligence in the execution of an arrest warrant.  *See United States v. Weaver*, 384 F.2d 879, 880 (4th Cir. 1967).  And, here, they did just that:  The warrant for Ordonez-Zometa's arrest was issued at 7:12 p.m. on March 12, 2019, and it was executed less than 24 hours later — at 6:50 p.m. on March 13, 2019.  *See* J.A. 110, 1920.  That should end the inquiry.  *Cf.* *Weaver*, 384 F.2d at 880-81 (upholding execution of an arrest warrant after a delay of more than two weeks).

In this appeal, Ordonez-Zometa urges our Court to look past the objective facts to examine and second-guess the officers' decision-making — specifically, why the officers chose to execute the arrest warrant when and where they did so.  But this proposition runs headlong into the well-settled principle of Fourth Amendment law of objective reasonableness.  This Court does not, and should not, inquire into the strategic motivations of arresting officers.  *See Ashcroft v. al-Kidd*, 563 U.S. 731, 736-37 (2011); *see also* *Brigham City*, 547 U.S. at 404.

To be sure, we have cautioned against law enforcement intentionally withholding the execution of an arrest warrant in hopes of gaining access to a location they could not otherwise search.  *See Weaver*, 384 F.2d at 880.  But that principle does not license us to disregard the rule that a Fourth Amendment analysis does not turn on the subjective

28

motives of the officers involved. *See Town of Castle Rock v. Gonzales*, 545 U.S. 748, 764 (2005) (recognizing discretion police possess in deciding when and how to execute warrants). Indeed, the courts have "almost uniformly rejected invitations to probe subjective intent." *See al-Kidd*, 563 U.S. at 737 (internal quotation marks omitted). And for good reason: "the Fourth Amendment regulates conduct rather than thoughts." *Id.* at 736 (citing *Bond v. United States*, 529 U.S. 334, 338 n.2 (2000)).

Nor is there any credible basis for concluding that the police officers in this situation sought to delay the arrest of Ordonez-Zometa for the purpose of manufacturing a pretext to search the Nissan. As discussed earlier, the officers did not need to rely solely on his presence in the vehicle to justify seizing it. Before the stop, they had solid reason to believe that the Nissan itself was an instrumentality of the John Doe murder offense, in that it had been used to transport Doe's body. That fact alone supported its seizure. And once lawfully seized, any search would have followed in accordance with standard procedures and would have been supported by a search warrant. See J.A. 1927-32.

At bottom, the traffic stop resulting in Ordonez-Zometa's arrest was not executed after an undue delay. And, as we have explained, the traffic stop and arrest of Ordonez-Zometa did not violate the Fourth Amendment. There thus was no error in the district court's denial of Ordonez-Zometa's motion to suppress evidence seized as a result of the traffic stop or Ordonez-Zometa's arrest.

2.

We next assess Ordonez-Zometa's challenge to the district court's denial of his motion to suppress statements made during the post-arrest custodial interrogation. He

argues that his statements were involuntary, citing both emotional distress and a misstatement by Detective DeLeon.  According to Ordonez-Zometa, he was handcuffed in an interrogation room for nearly four hours, during which he knew that his wife, his cousin's wife, and his two young children had been detained.  He claims he could hear his children crying and officers shouting at his cousin's wife.  He also contends that Detective DeLeon incorrectly advised him that his silence could be used against him at trial.  Although he acknowledges that he waived his *Miranda* rights, he maintains that the combined effect of the interrogation conditions and the Detective's misstatement overbore his will, rendering his statements involuntary and inadmissible.

Crucially, an accused's statements to the police during a custodial interrogation, even when preceded by a valid *Miranda* waiver, must be voluntary to be admissible.  *See United States v. Cristobal*, 293 F.3d 134, 140 (4th Cir. 2002); *see also generally Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  In considering whether a challenged statement was voluntary, we "must make an independent determination on the issue of voluntariness," and accept "the district court's findings of fact on the circumstances surrounding the confession . . . unless clearly erroneous."  *See United States v. Khan,* 461 F.3d 477, 497 (4th Cir. 2006) (internal quotation marks omitted).  In that regard, we review "the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation."  *See United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997) (internal quotation marks omitted).

A challenged statement is admissible if, given "the totality of all of the surrounding circumstances," the defendant's decision to speak with law enforcement was "the product

30

of an essentially free and unconstrained choice" and the statement was made "without any compelling influences." *See Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973); *Braxton*, 112 F.3d at 781. Conversely, if the defendant's "will has been overborne and his capacity for self-determination critically impaired," principles of due process bar the use of his statements. *See Culombe v. Connecticut*, 367 U.S. 568, 602 (1961); *see also United States v. Abu Ali*, 528 F.3d 210, 232 (4th Cir. 2008).

The question to be assessed, then, is whether Ordonez-Zometa's will was overborne by the presence of his family and Detective DeLeon's asserted misstatements. *See, e.g.*, *United States v. Holmes*, 670 F.3d 586, 591 (4th Cir. 2012). As we have explained, neither uncomfortable circumstances nor a misstep by law enforcement will render a statement involuntary. *Id.* at 592-93 ("Numerous cases reiterate that statements by law enforcement officers that are merely 'uncomfortable' or create a 'predicament' for a defendant are not ipso facto coercive."). And "[e]ven where threats, violence, implied promises, improper influence, or other coercive police activity exist, a confession is not necessarily rendered involuntary." *Id.* at 591 (internal quotation marks omitted). Rather, "[i]n determining whether a defendant's will has been overborne," we have "focused on the 'crucial element of police overreaching.'" *See Cristobal*, 293 F.3d at 141 (quoting *Colorado v. Connelly*, 479 U.S. 157, 163 (1986)). Indeed, "[w]hile each case has turned on its own set of factors justifying the conclusion that police conduct was oppressive, all have contained a substantial element of coercive police conduct." *Id.*

After its careful assessment of the circumstances of the interrogation here, the district court determined that Ordonez-Zometa's statements were voluntary and therefore

31

admissible. We discern no error in that ruling. As the court aptly explained, Ordonez-Zometa was held in an interview room for several hours but was not physically deprived or mistreated. *See* J.A. 697. His requests for water and restroom access were accommodated and, at his request, he was also moved to a less formal, off-camera setting for the interview. *Id.* at 698. Although Ordonez-Zometa told Detective DeLeon that he was tired, he did not say he was too tired to continue or ask to end the interview. *Id.* at 2479; *see also Holmes*, 670 F.3d 586, 592 (4th Cir. 2012) (explaining that "suppression is not required every time a defendant has a diminished mental state"); *Cristobal*, 293 F.3d at 141 ("[A] deficient mental condition . . . is not, without more, enough to render a waiver involuntary.").

And even though Ordonez-Zometa expressed concern for his family, the record shows that Detective DeLeon did not exploit those concerns. As the court observed, there was no suggestion that Ordonez-Zometa's emotions were manipulated in order to coerce him into a confession. *See* J.A. 697 (explaining that DeLeon did not seek to use his family "to extract a confession or to somehow trick Mr. Ordonez-Zometa into continuing conversation"). And to be sure, such evidence of coercion "is a necessary predicate to finding that a confession is not voluntary." *See Cristobal*, 670 F.3d at 592; *see also Connelly*, 479 U.S. at 167 (holding that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause"). Put simply, there is no evidence of "coercive police activity" on the part of Detective DeLeon that render Ordonez-Zometa's statements involuntary and therefore inadmissible. *Id.*

32

One specific aspect of the interview, however, gives pause. Detective DeLeon incorrectly indicated that if Ordonez-Zometa "remained silent, that could be used against him at trial." *See* J.A. 698. That misstatement was, as the district court recognized, unfortunate and plainly incorrect. *Id.* at 699 (describing DeLeon's statement as "certainly . . . a misstatement of law"); *id.* at 700 (describing misstatement as "not a good [factor] for the government"). But as we have recognized, a single misrepresentation is "insufficient, in and of [itself], to render a confession involuntary." *See United States v. Whitfield*, 695 F.3d 288, 302 (4th Cir. 2012). Again, we must assess whether the error *overbore* the defendant's will. *Id.* (citing *Frazier v. Cupp,* 394 U.S. 731, 739 (1969)). The court ruled that such an error did not occur, and its findings in that respect are supported by its detailed review of the video and audio recordings of the interview. *See* J.A. 700. Detective DeLeon's comment, while regrettable, was not coercive in the context of Ordonez-Zometa's entire interview. We are thus satisfied that his capacity for self-determination was not critically impaired by Detective DeLeon's misstatement.

Assuming *arguendo* that the challenged misstatement rendered Ordonez-Zometa's confession involuntary, its admission would nevertheless be harmless. *See Arizona v. Fulminante*, 499 U.S. 279, 296 (1991); *see also United States v. Gillon*, 704 F.3d 284, 293 (4th Cir. 2012). While a confession may be "the most probative and damaging evidence that can be admitted against a defendant," we have recognized that its admission is harmless where "the jury would have returned a verdict of guilty" without it. *See United States v. Johnson*, 400 F.3d 187, 197 (4th Cir. 2005) (internal quotation marks omitted). And we have deemed the admission of a confession to be harmless when the government

33

also "introduced an abundance of other evidence" and carried its burden to prove the defendant's guilt "without *any* use of his statements." *Id.* at 197-98.

And that is exactly what happened here. The prosecution introduced compelling and substantial evidence — wholly independent of Ordonez-Zometa's post-arrest statements — that proved his role in the murder of John Doe. Two former gang members confirmed that he ordered the killing of John Doe, arranged its logistics, directed others to dispose of Doe's body, and oversaw the cleanup. *See, e.g.*, *United States v. Burns*, 990 F.2d 1426, 1439 (4th Cir. 1993) ("The settled law of this circuit recognizes that the testimony of a defendant's accomplices, standing alone and uncorroborated, can provide an adequate basis for conviction."). Moreover, forensic evidence from the Nissan vehicle corroborated key aspects of those witnesses' accounts. The trial evidence thus provided the jury with ample grounds for conviction, entirely apart from the contested statements.

In sum, the circumstances of Ordonez-Zometa's custodial interrogation strongly support the district court's determination of voluntariness, and the isolated misstatement by Detective DeLeon does not undermine that conclusion. We therefore affirm the court's suppression ruling.

3.

Alternatively, Ordonez-Zometa asserts that, even if his statements were voluntary, certain of them — specifically, those he made more than six hours after his arrest — should have been suppressed under 18 U.S.C. § 3501(c), because of an undue delay in his presentment before a judicial officer. This argument fails for a simple reason: § 3501(c) does not apply here.

34

Under § 3501(c), "[i]n any criminal prosecution by the United States" for an "offense[] against the laws of the United States," a voluntary confession made within six hours of arrest is generally admissible. A confession made beyond the six-hour window and prior to presentment, however, is admissible only if the delay was reasonable. *See Corley v. United States*, 556 U.S. 303, 322 (2009); *see also United States v. Claridy*, 601 F.3d 276, 284-85 (4th Cir. 2010). But as the Supreme Court has made clear, the six-hour presentment rule codified in § 3501(c) applies only in federal prosecutions for violations of federal law. *See United States v. Alvarez-Sanchez*, 511 U.S. 350, 358 (1994); *see also United States v. Van Metre*, 150 F.3d 339, 348 n.4 (explaining that "the six hour safe harbor provision of [§ 3501(c)] is not triggered if the defendant is held only on state charges by state or local authorities"). Until a person is arrested or detained for a federal offense, there is no duty to bring that individual before a magistrate judge "empowered to commit persons charged with offenses against the laws of the United States." *See Alvarez-Sanchez*, 511 U.S. at 350. Accordingly, any delay in presentment while a defendant is held solely on state charges does not implicate § 3501(c).

That is exactly the situation here. Ordonez-Zometa was arrested and detained pursuant to a Virginia warrant for murder, a state-law offense. Federal charges were not filed until more than a year thereafter. *See* J.A. 31. Thus, at the time of his challenged confession, Ordonez-Zometa was being held solely on state charges, and § 3501(c) did not apply. The district court thus did not err in declining to exclude his statements under § 3501(c).

35

B.

We next consider Ortega-Ayala's challenge to the district court's denial of his motion to suppress evidence obtained by search warrants executed at his residence, with respect to his cell phones, and on his Facebook account. In support of this contention, Ortega-Ayala principally argues that the warrants were not supported by probable cause, in that those warrants lacked particularity and failed to establish a sufficient nexus between the areas to be searched and the seized evidence of criminal activity. *See* Appellants' Br. 33-34, 37-38, 41-42.

The foundational requirement for any search warrant is probable cause. *See* U.S. Const. amend. IV ("[N]o warrants shall issue, but upon probable cause . . . ."). Whether probable cause for a search warrant exists is a "practical, common-sense" inquiry into whether there is "a fair probability that contraband or evidence of a crime will be found in a particular place." *See Illinois v. Gates*, 462 U.S. 213, 238 (1983). Indeed, the probable cause standard "is not a high bar." *See District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (internal quotation marks omitted). We thus review a magistrate judge's decision to issue a search warrant with "great deference" and "ask only whether the judicial officer had a substantial basis for finding probable cause." *See United States v. Suiero*, 59 F.4th 132, 139 (4th Cir. 2023) (internal quotation marks omitted). And, in reviewing the district court's decision to deny Ortega-Ayala's motion to suppress, we review the legal conclusions of the district court de novo, and its factual findings for clear error. *See United States v. Seerden*, 916 F.3d 360, 365 (4th Cir. 2019).

36

The challenged affidavits readily satisfy the probable cause standard. Those affidavits linked Ortega-Ayala to the LGCS clique of MS-13, described his suspected role in the murder of John Doe, and provided "practical, commonsense" reasons to believe that evidence would be found at his residence and on his electronic devices. *See United States v. Orozco*, 41 F.4th 403, 409 (4th Cir. 2022). Take first, the affidavit supporting the search warrant for Ortega-Ayala's residence. It cogently explained that Ortega-Ayala returned to his home shortly after the murder and the disposal of John Doe's body. As the district court acknowledged, that timeline was sufficient to justify a search of his residence for physical evidence such as blood, clothing, or cleaning products that would tie Ortega-Ayala to the crime. *See* J.A. 644.

The warrant to search Ortega-Ayala's phone was similarly supported by substantial evidence suggesting that the murder of John Doe was recorded and that the video was circulated among gang members. It follows that Ortega-Ayala, having been involved in the Doe murder, would have accessed or stored that video on his phone. And it makes sense that his phone may have housed messages relating to the murder or to the LGCS enterprise's crimes. Likewise, the affidavit for the search of his Facebook account recited that MS-13 regularly used social media for internal communications — and, moreover, witnesses had attested to the fact that Ortega-Ayala maintained digital contact with other LGCS members — so it was entirely reasonable to search Ortega-Ayala's Facebook account for links to coconspirators.

The district court credited the foregoing representations. It acknowledged that witness interviews had linked Ortega-Ayala to the other coconspirators through personal

37

and digital communications via social media, text messages, and calls. *See* J.A. 656-57. The court also found that images of the victim were recovered from a coconspirator's phone and, given "the nature of the allegations," it was reasonable to infer that digital evidence concerning the planning and aftermath of Doe's murder might be found on Ortega-Ayala's devices or accounts. *Id.* at 652, 667. On this record, the court properly concluded that the search warrants were supported by probable cause, and they were not the kind of "generalized rummaging" prohibited by the Fourth Amendment. *Id.* at 657.

Our review of the record leads to the same conclusion as the district court: This was not a case of a "general warrant" or "rummaging." *Cf. Payton v. New York*, 445 U.S. 573, 583 (1980) (describing the dangers of "general warrants"); *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971) (describing "general, exploratory rummaging in a person's belongings"). The search warrant affidavits were particularized and specific. And the facts contained in those affidavits provided a "'substantial likelihood' that evidence of a crime [would] be found in the place to be searched." *See Suiero*, 59 F.4th at 140 (quoting *United States v. Allen*, 631 F.3d 164, 173 (4th Cir. 2011)). We are thus satisfied that the challenged search warrants were amply supported by probable cause.

But even if there had been a defect in the judicial officer's probable cause finding, the district court correctly determined that the officers executing the search warrants acted in good faith. *See United States v. Blakeney*, 949 F.3d 851, 859 (4th Cir. 2020); *see also United States v. Leon*, 468 U.S. 897, 922-23 (1984). As we have explained, the good-faith exception precludes the suppression of seized evidence where law enforcement has relied on a search warrant in an "objectively reasonable" manner, even if the warrant is later

38

found to be deficient. *See Blakeney*, 949 F.3d at 859; *see also United States v. Thomas*, 908 F.3d 68, 72-73 (4th Cir. 2018). The officers' reliance on the challenged warrants — which, contrary to Ortega-Ayala's characterizations, were not "bare bones" — was entirely reasonable. And the court's alternative good-faith determination was also sufficient, standing alone, to defeat Ortega-Ayala's suppression efforts.

In short, the district court correctly determined that the facts presented in the affidavits established substantial bases for separate findings of probable cause to search Ortega-Ayala's residence, his cell phones, and his Facebook account. The warrants were appropriately particularized, and the searches and seizures were lawful. We therefore affirm the district court's rulings in that regard.

## C.

We turn next to Hernandez-Garcia's contention that the district court erred in denying his post-verdict motion for a new trial under Federal Rule of Criminal Procedure 33. Hernandez-Garcia filed a post-verdict motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29 or, alternatively, for a new trial under Federal Rule of Criminal Procedure 33. We review de novo whether the court applied the correct legal standard in reviewing Hernandez-Garcia's Rule 33 motion, and we assess for abuse of discretion the denial of Hernandez-Garcia's motion for a new trial. *See, e.g.*, *United States v. Smith*, 451 F.3d 209, 216 (4th Cir. 2006); *see also, e.g.*, *United States v. Lewis*, 18 F.4th 743, 750 (4th Cir. 2021).

As an initial matter, these contentions necessitate a brief explanation of Federal Rules 29 and 33. Rule 29(c) provides that "[a] defendant may move for a judgment of

39

acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." *See* Fed. R. Crim. P. 29(c)(1). "[A] judgment of acquittal is appropriate when the evidence is so deficient that acquittal is 'the *only* proper verdict.'" *See United States v. Rafiekian*, 68 F.4th 177, 186 (4th Cir. 2023) (quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982)).

On the other hand, a new trial under Rule 33 "may be granted where the government has presented sufficient evidence for a reasonable jury to convict, but the court nevertheless 'disagree[s] with the jurors' weighing of the evidence' in finding the defendant guilty." *See Rafiekian*, 68 F.4th at 186 (quoting *Tibbs*, 457 U.S. at 42). Accordingly, a district court assessing a motion under Rule 33 — unlike a motion under Rule 29 — "conducts its own assessment of the evidence, unconstrained by any requirement to construe the evidence in the government's favor." *Id.* Put simply, while a district court may not draw inferences against the government when deciding a motion for judgment of acquittal, it may do so when considering a motion for a new trial. *See United States v. Campbell*, 977 F.2d 854, 860 (4th Cir. 1992).

Hernandez-Garcia contends that the district court improperly conflated its assessment of his motion for a new trial with his concurrent motion for a judgment of acquittal. The record, however, stands in stark contrast to Hernandez-Garcia's contention. To be sure, "[e]ven when the transcript does not explicitly show as much, trial judges are presumed to know the law and to apply it in making their decisions." *See United States v. Ali*, 991 F.3d 561, 570 (4th Cir. 2021) (internal quotation marks and alterations omitted). And nothing in this record undermines that settled proposition. Indeed, the court

40

recognized the difference between the standard for a motion for judgment of acquittal and the standard for a motion for a new trial. With regard to Hernandez-Garcia's motion for acquittal, the court acknowledged that the evidence must be viewed in the light most favorable to the government. And with regard to Hernandez-Garcia's motion for a new trial, it explained that "a different standard" applies, one that allows the court to vacate the verdict if "in the rare circumstance, the evidence weighs heavily against conviction." *See* J.A. 1879. Put simply, nothing in the record rebuts the presumption that the court knew the applicable law and actually applied it in denying Hernandez-Garcia's motions.

Notably, even Hernandez-Garcia concedes that the court properly recited the different standards. In his view, the court was required to independently reexamine the testimony of Agent DeJesus, the FBI expert who conducted the cell-site analysis of Hernandez-Garcia's phone, and make its own credibility assessments with respect to the testimony of former LGCS members. *See* Br. of Appellants 53-54. The court thus erred, Hernandez-Garcia claims, when it failed to "recognize that it ha[d] the ability, and the obligation, to make its own weighing of the evidence without considering it in the light most favorable to the government." *Id.* at 54.

Contrary to Hernandez-Garcia's argument, we have not gone so far as to say that a court is obliged to reweigh witness credibility. Rather, we have emphasized that, although a court "must remain cognizant of the demanding standard for jettisoning a jury verdict in favor of a new trial," it "*may* consider witness credibility" in determining whether a new trial is warranted. *See United States v. Millender*, 970 F.3d 523, 532 (4th Cir. 2020) (emphasis added); *see also United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir. 1985).

41

That is because "the court, like the jury, has the advantage of observing the witnesses as they testify," and thus is appropriately positioned to "evaluate the credibility of the witnesses." *Id.* (internal quotation marks and alterations omitted); *see United States v. Miller*, 41 F.4th 302, 315 (4th Cir. 2022) (internal quotation marks omitted).

As such, the district court was well within its discretion in declining to revisit the credibility of witnesses when nothing in the new evidence called it into serious doubt. The jury heard extensive evidence that Hernandez-Garcia participated in the planning and execution of the Doe murder, helped clean up the crime scene, and later cleaned the vehicle used to dispose of Doe's body. Two cooperating witnesses — both coconspirators — gave detailed, corroborated accounts of Hernandez-Garcia's involvement. Physical evidence such as DNA, video footage, and phone records further corroborated the government's presentation.

In these circumstances, the district court was entitled to conclude that the verdict was not against the weight of the evidence and that the challenged evidence did not create a "serious miscarriage of justice" that would warrant a new trial. *See Rafiekian*, 68 F.4th at 189. We thus affirm the denial of Hernandez-Garcia's motion for a new trial.

D.

Finally, we assess and resolve the Defendants' joint contention that the government failed to present sufficient evidence that the LGCS enterprise's activities affected interstate or foreign commerce. *See United States v. Mathis*, 932 F.3d 242, 258 (4th Cir. 2019) (explaining that the government must show "that an enterprise affecting interstate commerce existed" to sustain a RICO conviction). The government's failure, they contend,

42

dooms their convictions on Counts One, Two, and Three — that is, the RICO conspiracy charge, plus the VICAR murder and murder conspiracy charges. *See* 18 U.S.C. § 1962(c); 18 U.S.C. §§ 1959(a), (b)(2).[10]  The Defendants thus argue that those convictions must be reversed.  We are compelled to disagree.

In reviewing the sufficiency of the evidence presented, we are constrained to "sustain a jury's verdict when there is substantial evidence, construed in the light most favorable to the government, supporting the verdict."  *See Mathis*, 932 F.3d at 242. Importantly, our job is not to reweigh the trial evidence, but to determine whether "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *See United States v. Perry*, 92 F.4th 500, 514 (4th Cir. 2024) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

To sustain the Defendants' convictions under both RICO and VICAR, the prosecution had the burden of demonstrating that LGCS's activities affected interstate or foreign commerce.  In order to meet that burden, however, the government needed only to establish a "de minimis" effect on interstate or foreign commerce.  *See United States v. Barronette*, 46 F.4th 177, 203 (4th Cir. 2022); *see also United States v. Zelaya*, 908 F.3d 920, 926 (4th Cir. 2018).  Indeed, we have explained that "evidence of [an] enterprise's connection with interstate commerce" need not be "copious" to satisfy RICO's commerce element. *See United States v. Gray*, 137 F.3d 765, 773 (4th Cir. 1998).  Put otherwise, the

---

[10] Count 4, which charged a violation of 18 U.S.C. § 1512 pertaining to the Defendants' efforts to destroy and conceal evidence, does not have a commerce element.

government did not have to prove that the racketeering enterprise had a substantial impact on commerce, only that it had some nontrivial connection to it.

The Defendants readily acknowledge this standard, despite arguing that a stronger evidentiary showing was necessary here. *See* Appellants' Br. 45 (recognizing that "to satisfy the interstate commerce element of the RICO statute, the government must only prove a de 'minimis' effect on interstate commerce"). Congress intended both RICO and VICAR to reach criminal enterprises that, even in modest ways, touch the channels of interstate commerce. *See United States v. Whitehead*, 618 F.2d 523, 525 n.1 (4th Cir. 1980) (explaining that RICO "prohibitions apply to the use of racketeering activities to promote any enterprise affecting interstate commerce"). This "minimal threshold" can be readily satisfied by proof that the enterprise engaged in interstate commerce or by using instrumentalities of interstate commerce. *See United States v. Cornell*, 780 F.3d 616, 622-23 (4th Cir. 2015) (collecting cases). Indeed, our sister circuits have sustained RICO or VICAR convictions in situations where an enterprise "transport[ed] goods, such as firearms or stolen vehicles, across state lines," or where the enterprise used "Western Union, telephones, the U.S. Postal Service, and pagers to transfer money and communicate with each other in furtherance" of the enterprise's "criminal purposes." *See United States v. Mejia*, 545 F.3d 179, 203-04 (2d Cir. 2008); *United States v. Delgado*, 401 F.3d 290, 297 (5th Cir. 2005); *see also United States v. Atcheson*, 94 F.3d 1237, 1243 (9th Cir. 1996) (noting that "placement of out-of-state phone calls" further demonstrated a "connection with interstate commerce").

44

The trial evidence in these proceedings readily satisfies what our *Cornell* decision called a "minimal threshold."  *See* 780 F.3d at 622.  At trial, the jury heard testimony that LGCS members directly used an interstate financial system, Western Union, to collect dues and transfer those dues to gang leaders in El Salvador.  Jurors also learned that LGCS members used cell phones to coordinate gang business, including messages that shared a video of the murder at the heart of this case.  Indeed, Ordonez-Zometa used a cell phone to discuss John Doe's purported cooperation with police with "Pinguino," a high-ranking MS-13 member in El Salvador.  Moreover, jurors heard that multiple LGCS members used commercial ride-share services, such as Uber or Lyft, to travel across state lines from Virginia to Maryland on the night of the murder, and again the next morning.  This evidence was not merely suggestive of interstate commerce; it was specific and substantial evidence that the enterprise was reliant on commercial services that operate across state lines or are reliant on an interstate communications network.

On the basis of the extensive trial record and the various submissions of the parties, we are satisfied that the government introduced ample evidence for the jury to find beyond a reasonable doubt that the LGCS enterprise's activities satisfied the interstate commerce element of RICO and VICAR.  We therefore also sustain the guilty verdicts on Counts One, Two, and Three.

45

IV.

Pursuant to the foregoing, we affirm the challenged rulings of the district court and affirm the various convictions and sentences of Defendants Ordonez-Zometa, Ortega-Ayala, and Hernandez-Garcia.

*AFFIRMED*